188 So.2d 241 (1966)
Mrs. Marion Blcknell O'CONNOR
v.
Glyn A. DICKERSON and John Wiley Humphries, Executor of Estate of Elba Humphries, Deceased.
No. 44028.
Supreme Court of Mississippi.
June 20, 1966.
Bernard W.N. Chill, Jackson, for appellant.
Crawley, Brooks & Guyton, Kosciusko, for appellees.
ROBERTSON, Justice.
Elba E. Humphries and the appellant, then Marion Bicknell, became acquainted in 1918 when they both worked for the Federal Government in Washington, D.C. They became close friends, and lived together in Washington, D.C., New York City and St. Louis, Missouri, while both were employed *242 by the Federal Government. Miss Humphries was twelve years older than the appellant.
In 1951 Miss Humphries reached retirement age and appellant took early retirement so that they could continue to live together. On May 18, 1951, they purchased a home and acreage in Holmes County, Mississippi, for $14,500.00, taking title thereto as tenants in common. Of the consideration, $7,500 was paid in cash and an installment promissory note executed for the balance of $7,000, which note was secured by deed of trust on the property.
Miss Humphries soon paid $2,000 on the note, reducing the principal balance to $5,000, and all subsequent monthly installments have been paid by Miss Humphries alone. On July 8, 1964, when Miss Humphries died, there was still a principal balance of $800 due on the note and the deed of trust securing it was still outstanding, unsatisfied and uncancelled of record.
On April 2, 1952, Elba Humphries and appellant conveyed this property to John D. Guyton, and on the same day Guyton reconveyed the property to them, using the following language in so doing:
"I, John D. Guyton, a single person, convey and warrant unto Elba Humphries and Marion Bicknell, and to the survivor of them, as joint tenants and not as tenants in common, * * *."
Thereafter Elba Humphries and the appellant bought property in St. Petersburg, Florida, and began to spend part of their time there. In the latter part of 1960 the appellant, then Marion Bicknell, met a Mr. O'Connor and soon thereafter they were married. There was a complete disintegration of the friendship between Miss Humphries and Mrs. Marion Bicknell O'Connor, and they became bitter and hostile toward each other.
Elba Humphries returned to her home in Durant, Mississippi, and did not go to Florida again. The appellant continued to live in St. Petersburg, Florida, and only returned to Durant for a brief visit. She never lived again in the Durant home, but with her husband did spend three nights there in the latter part of June 1964, after Elba Humphries had moved to the Grenada Nursing Home.
On May 23, 1964, Elba Humphries and Mrs. Marion Bicknell O'Connor executed a detailed option contract wherein they agreed to sell the Durant property to Glyn A. Dickerson, who also signed and acknowledged the option contract. The sale price agreed upon was $19,000, and Elba Humphries and Marion B. O'Connor, as sellers, promised and covenanted in the contract as follows:
"* * * to make, acknowledge and deliver, upon the terms and conditions hereinafter set out, a good and sufficient general warranty deed in fee simple, accompanied by a full and complete abstract of title, to said lands to said party of the second part, if the said party of the second part shall within sixty (60) days from the date of this agreement pay or tender to the parties of the first part, their heirs, executors, administrators or assigns, the aforesaid purchase price:
Nine Thousand Five Hundred Dollars ($9,500.00) cash to be paid to Marion Bicknell O'Connor, and
Five Thousand Five Hundred Dollars ($5,500.00) cash to be paid to Elba E. Humphries, and
Party of the Second Part, or his assigns, promissory note in the principal sum of Four Thousand Dollars ($4,000.00) bearing interest at the rate of five (5) per centum, per annum, amortized, payable in installments of $75.00 monthly, commencing thirty days subsequent to the date of execution of such note, which said date shall be the closing date of the sale herein contemplated, and the date of payment of the aforementioned cash considerations, and continuing until all of said principal and interest have been paid, secured by a good and valid second lien on the above described property, payable *243 to Elba E. Humphries. The second lien herein provided for contemplates the Party of the Second Part of his assigns execution of a first lien on the above described property to secure a loan from some Third Party to the Party of the Second Part or his assigns for the principal sum of $15,000.00 plus interest thereon, but no additional amount." (Emphasis added.)
The option contract also contained the following terms and provisions:

"The consideration of this option in the event the sale is concluded in accordance with the provisions hereof shall be credited equally, pro rata, by the Parties of the First Part to the cash payments of the purchase price, but otherwise the same is the property of the Parties of the First Part.
The Parties of the First Part contract that the said lands shall be free from all liens and encumbrances at the date of closing and to indemnify fully the party of the second part against the same.

In the event the abstract is not acceptable to the Party of the Second Part's attorney, the Parties of the First Part shall have a reasonable time to cure any of the defects set forth in such attorney's title opinion." (Emphasis added.)
From the language used it can be plainly seen that this is not the usual and customary option agreement. It resembles in many respects an outright contract for the purchase and sale of real estate. In fact, the appellant testified that she knew Dickerson wanted to buy the property because he had signed the contract. The language used indicates that the sellers and purchaser contemplated that it would take about 60 days to close out the sale.
On May 25, 1964, Elba Humphries executed a general power of attorney to her nephew, John Wiley Humphries, authorizing him, among other things, to sell and mortgage her property. On behalf of his aunt and Mrs. O'Connor, Wiley Humphries had conferred several times with Dickerson, and had negotiated all the terms of sale set forth in the Option Contract.
On June 10, 1964, Elba Humphries closed her Durant home and moved to the Grenada Nursing Home. On the morning of July 8, 1964, she became gravely ill and was moved to the Grenada County Hospital where she died about 8:15 P.M. that night.
Dickerson secured from his employer, Southern Equitable Life Insurance Company of Little Rock, Arkansas, a commitment to make him a $15,000.00 loan on the property and the closing attorney, who represented both the sellers and the purchaser, was J.A. White, who subsequently became one of the two attorneys for appellant, Marion Bicknell O'Connor. In fact, the Bill of Complaint was prepared by and signed by him. Wiley Humphries from time to time talked with J.A. White and Dickerson about title questions that arose and about other requirements of the lender. Both White and Humphries advised appellant from time to time of the progress and the working out of the details of the sale.
On June 26, 1964, J.A. White submitted a certificate of title on the property to Southern Equitable Life Insurance Company in Little Rock, Arkansas, for the attention of W.E. Henslee, the attorney for the Company. In the opening paragraph of his certificate, White referred to his telephone conversation with Henslee on June 25, 1964. The first of 5 numbered exceptions listed in the certificate of title was a deed of trust, dated June 2, 1951, executed by Humphries and Bicknell to S.O. Horton, beneficiary, securing the balance of the purchase price.
In the latter part of June, 1964, after securing permission from Wiley Humphries, the agent and representative of Elba Humphries and Marion Bicknell O'Connor, Dickerson went on the premises and trimmed the shrubbery, cleared the underbrush, painted the house, and made some other repairs. On July 3, 1964, again with Humphries' permission, he and his *244 family, consisting of his wife and four children, moved into the house.
On July 6 and 7, 1964, Dickerson had three long distance telephone conversations with W.E. Henslee, the attorney for the lending insurance company, wherein Dickerson cleared up the matter of satisfying the old deed of trust on the property, and secured a promise from Henslee to send on the $15,000.00 check for the loan, to J.A. White the closing attorney. The check and covering letter were actually dated July 9, 1964, and were in J.A. White's office when he returned from a week's vacation on July 11.
On July 8, 1964, when Elba Humphries' condition was fully realized, Wiley Humphries got in touch by telephone with Dickerson in Pine Bluff, Arkansas. He made this call from John D. Guyton's office in Kosciusko, and in the course of the conversation Dickerson instructed Guyton to accept as his agent a deed from Wiley Humphries, attorney-in-fact for Elba Humphries, conveying her undivided one-half interest to Dickerson. The deed was prepared by Guyton and signed in his office about 5:15 P.M. by John Wiley Humphries as attorney-in-fact for Elba E. Humphries. The deed was handed to Guyton and by him handed back to Wiley Humphries so that it could be acknowledged before a Notary Public.
In addition to the deed, Guyton prepared two promissory notes for Dickerson to sign. One note was for $5,500.00, payable on demand, and the other for $4,000.00 payable in monthly installments. Letters also were prepared by Guyton for Dickerson to sign, addressed to Mrs. O'Connor and Miss Elba E. Humphries, advising them that Dickerson was exercising his option to purchase the property. These letters and notes, along with the deed, were brought by Wiley Humphries to Durant and about 10:15 P.M. that night the deed was acknowledged by Wiley Humphries before a Notary Public in Durant, and then personally delivered to Dickerson, who in turn signed the two promissory notes and handed them to Humphries. Dickerson had returned to Durant about 9:30 P.M. and had gone directly to Humphries' home to await his return. The letters to Mrs. O'Connor and Miss Elba Humphries were signed by Dickerson, and mailed about 11:30 P.M. that night.
The Appellant, Mrs. O'Connor, refused the request of Dickerson to execute to him a warranty deed conveying her undivided one-half interest in the Durant property in exchange for $9,450 cash, all in accordance with the Option Contract.
She brought suit against the Appellees, John Wiley Humphries and Glyn A. Dickerson, praying that the Court set aside and cancel as a cloud on her title to the whole property, the general warranty deed executed on July 8, 1964, by John Wiley Humphries, Attorney-in-fact for Elba E. Humphries, to Glyn A. Dickerson, conveying an undivided one-half interest in the property, and also praying for damages, actual and punitive, against Dickerson for moving on the property and cutting trees and making changes in the property. Dickerson filed a cross-bill praying for specific performance of the option contract entered into on May 23, 1964, by the appellant and Elba E. Humphries as Sellers and Dickerson as Purchaser.
The Chancellor, after a full hearing on the merits, dismissed the Bill of Complaint and ordered specific performance of the Option Agreement in accordance with the prayer of the Cross-Bill of Dickerson, one of the Appellees.
The contention of the Complainant-Appellant in the Court below and in this Court is that upon the death of Miss Elba E. Humphries the title to the entire property vested in her by virtue of the joint tenancy with the right of survivorship contained in the deed of April 2, 1952, of John D. Guyton.
The Respondents-Appellees contend that the joint tenancy with the right of survivorship was terminated in one or more of the following ways:
1. There was a valid conveyance of the interest of Miss Humphries during her lifetime.
*245 2. The Option Contract entered into by the owners of said lands to sell the lands to Mr. Dickerson terminated the joint tenancy and the right of survivorship.
3. The Option Contract, upon acceptance by Mr. Dickerson, became a binding contract of sale and terminated the joint tenancy with the right of survivorship.
We agree with the learned Chancellor in his findings in favor of Appellees on the second and third grounds mentioned above. In his written opinion, the Chancellor reasoned thusly:
"The Court is of the opinion that the option contract by its terms indicated that the parties intended to terminate the joint tenancy and the right of survivorship. The contract provided for the payment to Mrs. O'Connor of $9500.00 cash and to Miss Humphries of $5500.00 cash and a note for $4000.00 secured by a second deed of trust. The contract provided that `said party of the second part shall within 60 days from the date of this agreement pay or tender to the first parties, their heirs, executors, administrators or assigns, the aforesaid purchase price'. If it had not been the intention to terminate the joint tenancy and right of survivorship, these words would be meaningless and of no significance. The contract by its terms made the payment of the purchase price to the parties of the first part, their heirs, executors, administrators or assigns. This is inconsistent with the right of survivorship, since until the death of the parties or one of them there would be no heirs, executors or administrators. This contract terminated the joint tenancy and the right of survivorship.
The Court is of the opinion that the option was exercised by Mr. Dickerson during the lifetime of Miss Elba Humphries and thereby became a valid and binding contract for the sale and purchase of the property therein described on the terms therein set out. This terminated the joint tenancy and right of survivorship."
It is true that joint tenancies are not favored in Mississippi, but it is also true that joint tenancies may be created by the use of specific language in the deed or other instrument. Mississippi Code of 1942, Recompiled (1956), Section 834. Of course, there is no question that a joint tenancy with right of survivorship was created by Guyton's deed of April 2, 1952.
A joint tenancy once created, however, is not inviolate and irrevocable. 20 Am.Jur.2nd, Cotenancy and Joint Ownership, Section 19 at 112-113 (1965), has this to say on severing or terminating a joint tenancy.

"A joint tenancy may unquestionably be terminated by contract or agreement of the joint tenants as between themselves. While it appears that this result may not be achieved by mere words of election without some act operative to sever the property interests in point of law, it is clear that a joint tenancy may be severed by direct provision of an agreement entered into by the joint tenants. Further, a joint tenancy may be deemed to be terminated by implication where the joint tenants enter into a valid contract containing provisions inconsistent with continuation of the joint tenancy." (Emphasis added.)
The intent of Elba E. Humphries and Marion Bicknell O'Connor, Parties of the First Part, in the Option Agreement of May 23, 1964, was clearly to terminate once and for all the joint tenancy. The strained, bitter and hostile feeling of each toward the other from 1961, on, support and buttress their clear intent finally expressed in unmistakable language on May 23, 1964, when each knowingly, willingly and voluntarily signed and acknowledged the detailed Option Agreement. This Court would not and could not be a party to breathing new life into the lifeless corpse of a joint tenancy declared dead by the creators of it.
It is not necessary to detail again the many ways in which Dickerson clearly conveyed to Elba E. Humphries and Marion *246 Bicknell O'Connor; John Wiley Humphries, their agent; and James A. White, their closing attorney; his acceptance of the Option Contract. Suffice it to say, that by his actions and words in June, 1964, Dickerson let them know that he was exercising his option and was moving full speed ahead to perfect the title, to close his loan and to close the sale. Mrs. O'Connor was not misled in any way by his actions. In fact, she finally admitted in her testimony that she knew that Dickerson was buying the property, that he was getting a loan on it and that J.A. White was the closing attorney. She knew that Wiley Humphries was acting for Elba and for her in dealing with this property and in helping perfect the title and close the sale, and she gladly accepted his efforts.
It ill becomes Mrs. O'Connor, when death has sealed the lips of her erstwhile friend, to come into a court of conscience and to renege on a solemn contract. Equity courts still faithfully follow the ancient maxim that "He (the masculine embraces the feminine) who seeks equity, must do equity." The Chancellor applied this maxim and we affirm his action in so doing.
Judgment affirmed.
GILLESPIE, P.J., and PATTERSON, INZER, and SMITH, JJ., concur.